PRECEDENTIAL
UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 15-2664
_____

OFI ASSET MANAGEMENT;
TIMBER HILL LLC,
individually and on behalf of all others similarly situated,
Appellants

v.

COOPER TIRE & RUBBER;
ROY ARMES;
BRADLEY HUGHES
_____

On Appeal from the United States District Court
for the District of Delaware
(D.C. No. 1-14-cv-00068)
District Judge: Hon. Richard G. Andrews
_____

Argued March 1, 2016

Before: AMBRO, JORDAN, and SCIRICA, *Circuit Judges*.

(Opinion Filed: August 22, 2016)
_____

Jonathan H. Beemer
Vincent R. Cappucci
Andrew J. Entwistle
Entwistle & Cappucci
299 Park Avenue
20th Floor
New York, NY 10171

James A. Harrod   [ARGUED]
Lauren A. Ormsbee
Bernstein Litowitz Berger & Grossmann
1251 Avenue of the Americas
44th Floor
New York, NY 10020
        *Counsel for Appellants*

2

Marjorie P. Duffy
Jones Day
325 John H. McConnell Boulevard
Suite 600
P.O. Box 165017
Columbus, OH 43215

Stephen C. Norman
John A. Sensing
Potter, Anderson & Corroon
1313 N. Market Street
6th Floor
Wilmington, DE 19801

Adrienne F. Mueller
Geoffrey J. Ritts   [ARGUED]
Jones Day
901 Lakeside Avenue
North Point
Cleveland, OH 44114
        *Counsel for Appellees*

_____

OPINION OF THE COURT
_____

JORDAN, *Circuit Judge*.

This suit is what remains from a failed merger between Cooper Tire & Rubber Company ("Cooper") and Apollo Tyres Ltd. ("Apollo"). OFI Asset Management and Timber Hill LLC – purporting to act for themselves and other

3

similarly situated investors (collectively, "OFI")[1] – filed this securities class action in the United States District Court for the District of Delaware against Cooper and two of its officers. OFI claims that, during the course of merger negotiations between Cooper and Apollo, the defendants made material misrepresentations in statements to investors, resulting in violations of federal securities laws. The District Court dismissed OFI's complaint in its entirety. OFI now appeals, complaining that the District Court improperly managed the presentation of arguments and wrongly dismissed the case. Because we conclude that the District Court acted within its discretion on case management and was correct in its decision that OFI failed to allege sufficient facts to support its claims, we will affirm.

## I.   BACKGROUND

### A.   FACTUAL BACKGROUND[2]

Cooper is a one-hundred-year-old tire manufacturer based in Findlay, Ohio. The individual defendants, Roy Armes and Bradley Hughes, were, respectively, Cooper's Chief Executive Officer and Chief Financial Officer during the time relevant to this action. Cooper's international operations included Cooper Chengshan Tire Company, Ltd. ("CCT") in China, a joint venture formed in 2006, 65% of

---

[1] For simplicity, we will refer to OFI in the singular.

[2] We recount the facts in the light most favorable to OFI. *See Kanter v. Barella*, 489 F.3d 170, 177 (3d Cir. 2007).

which was owned by Cooper. Chengshan Group ("Chengshan"), led by Chairman Che Hongzhi ("Che"), owned the remaining 35% of CCT. As of mid-2013, CCT was Cooper's most profitable manufacturing facility, contributing approximately 25% of Cooper's revenue and profits.

Cooper's presence in China was a key motivation behind Apollo's efforts to merge with Cooper. Those efforts began in August 2012, when Apollo suggested the possibility of buying Cooper for $22.75 per share. Flirtation progressed to "serious" discussions in January 2013. (J.A. at 55, ¶ 48). Between late 2012 and June 2013 (the "negotiation period"), Cooper explored merger opportunities with Apollo as well as other parties. In January 2013, Chengshan indicated that it, with unidentified partners, might submit a bid for Cooper.

On March 7, 2013, Cooper met with Apollo to discuss the details of a potential deal, including Che's possible reaction to the merger. Armes asserted that "Cooper did not know how Chairman Che would react" and that his reaction could be anything from favorable to antagonistic; it was possible he would "really support it," "sell his 35% stake," or "try to undermine" it. (J.A. at 41, 55-56, ¶¶ 8, 50.) Cooper and Apollo also addressed (among other contingencies) the possibility that a union representing Cooper employees, the United Steelworkers Union ("USW"), would file grievances if a transaction were announced.

On April 10, "Party C," which allegedly was a consortium including Chengshan, communicated that it intended to make a proposal to purchase Cooper. While Party C was in frequent communication with Cooper during the

negotiation period, it never made a definitive proposal. During this period, Apollo and Cooper met with Che, who expressed opposition to a merger between Cooper and Apollo and suggested that he would prefer to "keep things going the way that [they] were." (J.A. at 41, ¶ 8.)

On June 12, Cooper and Apollo announced that they had entered into an agreement whereby Apollo would acquire Cooper for approximately $35 per share, a figure amounting to some $2.5 billion and representing a 40% premium over Cooper's thirty-day volume-weighted average price.

The Merger Agreement contained several disclaimers, one of which noted that the "representations and warranties … set forth herein shall be true and correct in all respects ... both when made … and as of the Closing Date." (J.A. at 169.) The SEC Form 8-K that accompanied the Agreement warned against reliance on the Agreement, saying "[t]he Merger Agreement contains representations and warranties made by [Cooper] and the Apollo Parties to, and solely for the benefit of, each other. … You should not rely on the representations and warranties in the Merger Agreement as characterizations of the actual state of facts about the Company or the Apollo Parties." (Opening Brief in Support of Motion to Dismiss, Ex. G, at 3, *OFI Risk Arbitrages v. Cooper Tire & Rubber Co.*, No. 14-cv-68-RGA (D. Del. Dec. 15, 2014), ECF No. 54.)

The Merger Agreement also included an extensive series of warranties. Those warranties provided, among other things, that Cooper "or one of its Subsidiaries has exclusive possession of each Owned Real Property and Leased Real Property" referenced in the Agreement (J.A. at 165), that

6

there was no "pending or … threatened … labor strike or lock-out or any material dispute, walk-out, work stoppage or slow-down involving [Cooper] or any of its Subsidiaries" (J.A. at 164), and that Cooper maintained "effective" "internal control over financial reporting" (J.A. at 162).

The reaction at CCT's facility to the merger announcement was negative. CCT workers went on strike on June 21. Although they returned to work on June 28, they resumed their strike a few weeks later on July 13. The workers finally returned to work on August 17 but they denied Cooper officials access to the facility, and they also stopped producing Cooper-branded tires. By August 19, CCT had stopped providing financial information to Cooper. Cooper disclosed that fact in its next public filing, the August 30 Proxy Statement. In the meantime, on August 9, Cooper filed its 10-Q for the quarter ending June 30. That document disclosed a "temporary work stoppage" and a complaint filed by CCT's union. Cooper reported no material changes to its internal controls during that quarter, but it warned that the as-yet "temporary" CCT strike could hurt future performance if it persisted. (J.A. at 141.)

The merger announcement also elicited a labor dispute in the United States. On August 1, the USW filed grievances alleging that the proposed merger violated its collective bargaining agreements. Cooper and Apollo sought expedited arbitration to preserve the timeline for closing the merger. The arbitrator ultimately ruled in favor of the USW and barred Cooper from selling two of its plants to Apollo, "unless and until the [USW] ha[s] entered into agreements with" Apollo. (J.A. at 149). Cooper disclosed the arbitration result to shareholders in an 8-K filing on September 19, 2013,

7

and it included assurances that it and Apollo were "continuing discussions with the [USW] with an aim of reaching an amicable resolution quickly to minimize any impact on the original closing schedule" and that the two companies "remain firmly committed to the strategic rationale for the Merger … and are optimistic that a mutually beneficial settlement can be reached." (J.A. at 149.) As a result of this new hurdle, Apollo asked Cooper on September 25 to accept a price reduction. Cooper declined. That fact was not disclosed to shareholders, even though they were slated to vote on the merger five days later.

On August 30, Cooper issued its Proxy Statement, which described its intent to "work toward resolving [the CCT labor] issues and returning the facility to full, normal operation again as soon as possible." (J.A. at 201.) Although Cooper warned that it could not "assure [investors] that any of our expectations … will be achieved," the Proxy nevertheless concluded that "[n]either the [CCT] strike nor the plant slowdown are expected to have an effect on the consummation of the merger." (J.A. 182, 201.)

The Proxy also detailed the events leading up to the Merger Agreement, identifying all suitors other than Apollo by pseudonyms. It did not identify Party C as being affiliated with Chengshan. The Proxy included projections that Cooper had shared with Apollo and other potential purchasers during the negotiation period, as well as projections Cooper provided to its bankers to form a fairness opinion regarding the merger. But the Proxy was explicit that the projections were included "only because this information was provided to [Apollo], certain other potential purchasers and [Cooper's] financial advisor" during negotiations. (J.A. at 197.) It cautioned that

the projections were based on "assumptions that may now be outdated" and instructed that "[y]ou should not regard the inclusion of these projections … as an indication that Cooper [or] [Apollo] … considered or consider the projections to be necessarily predictive of actual future events, and you should not rely on the projections as such." (J.A. at 198.) The Proxy also stated that the projections were "aspirational … rather than likely projections," and it was candid that Cooper would not "make other projections public in the future." (*Id.*)

On September 30, Cooper stockholders approved the merger with Apollo. That approval was announced in an 8-K and was accompanied by a statement from Armes describing the planned merger as a "compelling transaction" and asserting that the resulting company would have a "strong global footprint that includes a presence in ... the fastest growing geographies of India and China." (J.A. at 110, ¶ 86.) The 8-K did not mention Apollo's continued requests for a price reduction.

Having secured stockholder approval, Cooper reached out to Apollo to close the deal. It refused, and Cooper filed suit against Apollo on October 4, 2013 in the Delaware Chancery Court, seeking to force Apollo to consummate the deal according to the terms of the Merger Agreement. Cooper asserted that Apollo had failed in its duty to use its "reasonable best efforts" to reach an agreement with the USW, as required by the arbitration decision issued the previous month, and that, but for that failure, the merger could have closed as planned. *Cooper Tire & Rubber Co. v. Apollo (Mauritius) Holdings Pvt. Ltd.*, No. CV 8980-VCG, 2013 WL 5977140, at *1 (Del. Ch. Nov. 9, 2013) ("*Cooper Chancery Case*"). Apollo, in response, asserted that Cooper

9

had not satisfied all of the conditions precedent for the closing, citing in particular the inadequate provision of financial data. *Id.* The case generated substantial discovery and culminated in a three-day trial in early November 2013. *Id.*

On November 8, following an unsuccessful interlocutory appeal, the Court of Chancery denied Cooper's request for specific performance. *Id.* The Court found that Apollo had not, by that point, breached the duty to exercise "reasonable best efforts" in negotiating a new agreement with the USW, but it instructed that Apollo must continue those negotiations as required by the Merger Agreement. *Id.* Having resolved the claim for immediate injunctive relief, the Court declined to rule on whether Cooper had, in fact, met the conditions precedent for the closing, describing the question as "hotly contested." *Id.* That question thus remained unresolved.

No significant progress was made toward closing, and on December 30, 2013, Cooper formally terminated the planned merger, telling investors via webcast that the financing for the deal had fallen through and that it was "a reality that the [Merger Agreement] both companies signed on June 12 [would] not be consummated by Apollo." (J.A. at 90, ¶ 134.)

## B.    PROCEDURAL BACKGROUND

In January 2014, OFI filed this action in the District Court. (J.A. at 24.) Its amended complaint (the "Complaint") alleges that Cooper violated Sections 10(b), 14(a), and 20(a) of the Securities Exchange Act of 1934 (the "'34 Act"),

10

codified at 15 U.S.C. §§ 78j(b), 78n(a), and 78t(a).  Cooper moved to dismiss the Complaint for failure to satisfy the heightened pleading burden that, under the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), applies to securities fraud claims.  Oral argument on the motion to dismiss was granted, and, because the claims center on allegations that Cooper told falsehoods, the District Court ordered OFI to submit a letter "identifying and verbatim quoting" the five most compelling examples it could muster of false or fraudulent statements by Cooper, with three factual allegations demonstrating the falsity of each statement and three factual allegations supporting a finding of scienter as to

11

the making of the statements.[3]  (J.A. at 31 (Docket entry No. 60).)  The Court stated that oral argument would focus on OFI's response.  (*Id.*)

On March 11, 2015, the District Court heard two hours of argument on Cooper's motion to dismiss and OFI's allegations.  During argument, the Court also requested supplemental information, which the parties subsequently provided.

The District Court ultimately granted Cooper's motion to dismiss, determining that OFI had failed to state a claim

---

[3] The order stated:

Plaintiff is requested to submit a letter by March 4 identifying and verbatim quoting its five most compelling false or fraudulent statements, including the date on which they were made, with two paragraphs in support of each statement, one identifying no more than three factual allegations in support of the falsity, with each factual allegation citing the paragraph of the amended complaint in which it appears, and the second identifying no more than three factual allegations as to why at least one of the individual defendants knew it was false, again with citations to the amended complaint's paragraphs for support. No legal argument. Oral argument is to focus on Plaintiff's letter.

(J.A. at 31.)

12

that satisfied the pleading standard of the PSLRA. The Court determined that the statements identified as problematic by OFI were either not false or misleading, were "forward-looking" statements protected by the safe harbor established by the PSLRA, lacked a sufficient showing of scienter, or suffered from some combination of those infirmities. *OFI Risk Arbitrages v. Cooper Tire & Rubber Co.*, No. 14-cv-68-RGA, 2015 WL 4036179 (D. Del. July 1, 2015). OFI timely appealed.

## II.  DISCUSSION[4]

### A.  STANDARD OF REVIEW

Our review of the District Court's dismissal of OFI's Complaint is plenary. *See Great W. Mining & Mineral Co. v. Fox Rothschild, LLP*, 615 F.3d 159, 163 (3d Cir. 2010). When ruling on a motion to dismiss under Rule 12(b)(6), a court must "accept as true all [factual] allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the plaintiff." *Kanter v. Barella*, 489 F.3d 170, 177 (3d Cir. 2007) (quoting *Evancho v. Fisher*, 423 F.3d 347, 350 (3d Cir. 2005)). Ordinarily, it is sufficient to plead facts that do no more than raise an allegation to the level of plausibly warranting relief. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (to survive a motion to dismiss, a complaint

---

[4] The District Court had federal question jurisdiction under 28 U.S.C. § 1331. We have jurisdiction to review the final judgment of the District Court pursuant to 28 U.S.C. § 1291.

13

must contain "enough facts to state a claim to relief that is plausible on its face"). But in cases alleging securities fraud, plaintiffs must "satisfy the heightened pleading rules codified in" the PSLRA. *Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 252 (3d Cir. 2009).

"[T]o restrict abuses in securities class-action litigation," *In re Suprema Specialties, Inc. Secs. Litig.*, 438 F.3d 256, 276 n.8 (3d Cir. 2006) (internal quotation marks omitted), the PSLRA requires that the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed," *id*. at 276 (quoting 15 U.S.C. § 78u-4(b)(1)(B)). This standard "requires plaintiffs to plead the who, what, when, where and how: the first paragraph of any newspaper story." *Avaya*, 564 F.3d at 253 (internal quotation marks omitted). A complaint must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," U.S.C. § 78u-4(b)(2)(A), specifically "scienter," which is defined in this context as a "knowing or reckless" mental state "embracing intent to deceive, manipulate, or defraud." *Avaya*, 564 F.3d at 252 (internal quotation marks omitted).

OFI primarily alleges that Cooper made material misrepresentations to shareholders in violation of § 10(b) of the '34 Act. "The [Supreme] Court [has] prescribed a three-step process for considering a motion to dismiss in a § 10(b) action." *Winer Family Trust v. Queen*, 503 F.3d 319, 327 (3d Cir. 2007) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*

14

551 U.S. 308, 322-23 (2007)). First, as with all motions under Rule 12(b)(6), we must "accept all factual allegations in the complaint as true." *Tellabs,* 551 U.S. at 322. Second, we "must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Id.* Third, "in determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." *Id.* at 323. Only a complaint that provides sufficiently particularized factual pleading and gives rise to a strong inference of scienter can survive a motion to dismiss.

In addition to establishing a heightened pleading standard, the PSLRA provides a so-called "safe harbor" that immunizes certain "forward-looking" statements from §10(b) liability. That immunity applies if either the "forward-looking statement is … identified as [such], and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement" or the plaintiff fails to prove the forward-looking statement "was made with actual knowledge by [the speaker] that the statement was false or misleading … ."[5] 15 U.S.C. § 78u-5(c)(1).

---

[5] "The term 'forward-looking statement' is broadly defined in the statute … ." *Avaya,* 564 F.3d at 255. The definition captures a wide range of statements, including those

15

That disjunctive statutory test provides two distinct entrances to the safe harbor.[6] The first requires the use of "meaningful cautionary statements" regarding the forward-looking statement. 15 U.S.C. § 78u-5(c)(1)(A)(i). "[A] vague or blanket (boilerplate) disclaimer which merely warns the reader that the investment has risks will ordinarily be inadequate to prevent misinformation. To suffice, the

> containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items"; statements of "the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer"; or statements of "future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the [SEC].

*Id.* (quoting 15 U.S.C. § 78u-5(i)(1)(A)-(C)).

[6] The statute in fact provides a third entrance to the safe harbor by immunizing statements that are "immaterial." 15 U.S.C. § 78u-5(c)(1)(A)(ii). But, since the regulation based on § 10(b) already imposes a materiality requirement, 17 CFR 240.10b-5, that entrance is not relevant in cases claiming a § 10(b) violation.

16

cautionary statements must be substantive and tailored to the specific future projections, estimates or opinions in the [documents] which the plaintiffs challenge." *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 243 n.3 (3d Cir. 2004) (internal quotation marks omitted). However, even in the absence of such meaningful cautionary language, the second entrance to the safe harbor is available to "immunize[] from liability any forward looking statement [if] … the plaintiff fails to show the statement was made with actual knowledge of its falsehood." *Avaya*, 564 F.3d at 254. Thus, any forward-looking statement is protected if it is either accompanied by "substantive and tailored" cautionary statements or if the plaintiff fails to show "actual knowledge of falsehood."

## B. SCIENTER AND CASE MANAGEMENT

Before delving into the details of OFI's allegations, we first address OFI's broader complaint that the District Court mismanaged the debate over the motion to dismiss. OFI protests that the District Court erred first by failing to consider all of the alleged misrepresentations and then by failing to consider holistically the allegations of scienter. OFI attributes both errors, at least in part, to how the Court managed the presentation of arguments; in particular, it complains of the Court's order requiring OFI to focus argument on only five "artificial[ly] select[ed]" allegations of misstatements. (Opening Br. at 24.)

OFI's umbrage is unfounded. A District Court enjoys substantial discretion in managing complex disputes, particularly when, as in this case, the claims become unwieldy. *See In re Westinghouse Sec. Litig.*, 90 F.3d 696,

17

703 (3d Cir. 1996) (confirming that a court acted within its discretion in dismissing an "unnecessarily complicated and verbose" complaint for failure to adhere to Rule 8 of the Federal Rules of Civil Procedure). OFI's Complaint stretches to nearly 100 pages and 245 paragraphs, throughout which it interweaves allegations about the factual circumstances surrounding the merger with citations to the specific statements it avers are misrepresentations. As pled, the Complaint presents an extraordinary challenge for application of the highly particularized pleading standard demanded by the PSLRA. This is true not only due to the length of the Complaint, but also its lack of clarity. It is difficult to discern precisely which statements OFI alleges to be actionable, let alone what specific facts are asserted to support each such allegation. The District Court rightly demanded that OFI make its contentions more clear, and the efficacy of that demand is borne out by OFI's letter in response to that order, which is much more comprehensible than the Complaint. (*See* Letter from Andrew J. Entwistle and James A. Harrod dated March 4, 2015, *OFI Risk Arbitrages v. Cooper Tire & Rubber Co.*, No. 14-cv-68-RGA (D. Del.), ECF No. 61.) OFI itself acknowledged during the hearing that its arguments "need[ed] to be organized in some way." (J.A. at 244.) Now that OFI has come to us with the same kind of broad averments that drove the District Court to demand specificity, we find ourselves more than sympathetic to that Court's position.

OFI contends that, as a result of the District Court's improperly constraining order, there were six additional "misrepresented and concealed material facts" and omissions

18

that the Court did not consider: [7] 1) statements in the Merger Agreement regarding internal controls for financial reporting, 2) the characterization in the 10-Q of the strike as a "temporary work stoppage" by a "unionized workforce," 3) statements in the Proxy Statement regarding internal controls for financial reporting, 4) misleading statements in the September 19, 2013 8-K filing regarding the effect of the USW arbitration decision on the merger, 5) an omission in that same 8-K of the fact that Apollo "refus[ed] to close the Merger absent a price reduction," and 6) the characterization in the September 30, 2013 8-K of the merger as a "compelling transaction" that would create a strong global company. (Opening Br. at 29 & n.4.)

Yet at no point before the District Court did OFI protest that these were important issues that required the Court's attention, let alone did OFI point to particularized facts to support such an argument.[8] Its kitchen-sink pleading

---

[7] Though OFI enumerates five such misrepresentations, it actually shoehorned a sixth in through a footnote. It took the same approach in its letter to the District Court, as noted by the Court during the argument on the motion to dismiss. (*See* J.A. at 210 (wherein it refers to OFI's disobedience to its order limiting the number of arguments they were to highlight, stating, "I see that [OFI] couldn't, actually, follow my instructions, or they could follow my instructions, but decided to add in some stuff of their own.").)

[8] And, in fact, OFI's briefing before us continues this trend. It neglects to address its allegations regarding "internal controls" language in the Proxy Statement, and the three complaints related to the 8-K filings receive superficial

has been a hindrance at every stage of these proceedings. There is some irony, then, to OFI's criticism of the District Court's effort to bring order to the sweeping denunciations in the Complaint. It was OFI's job to frame a comprehensive set of allegations to support its claims for relief. When the District Court tried to give OFI an assist by ordering greater specificity, the latter in fact did a much better job of framing the issues. But here we are now, facing OFI's objection that arguments it did not prioritize when given the chance to do so are somehow critical to its case. The reality is that the specific allegations considered by the District Court were not selected at random, but were the several chosen by OFI. They were its best arguments, and the District Court found them all unavailing. OFI was permitted to bring its most compelling arguments to the table, and, when it did, it made no meaningful objection to the limitations imposed by the District Court. Under the circumstances, the Court's approach was not problematic.[9]

treatment at best. Only the internal control assertions from the Merger Agreement and the characterization of the work stoppage in the 10-Q are supported by developed arguments. That the treatment OFI gave to ostensibly important additional issues was so minimal, and was dwarfed by the treatment of the issues that were squarely before and addressed by the District Court, only reinforces our conclusion that OFI's complaint that the District Court ignored important allegations is without merit.

[9] We should not be misunderstood on this point. It is certainly possible for a court to go too far in limiting the number or character of arguments it will consider, but the

20

This is true even though OFI contends that the District Court erred by failing to follow *Tellabs*'s instructions "to consider the allegations of scienter holistically," and that the Court instead drew "conclusions concerning scienter [that] were limited to specific alleged misstatements and isolated allegations rather than the fraudulent scheme as a whole." (Opening Br. at 26.) While we agree that scienter must be considered holistically, we are persuaded that the District Court did precisely that.[10] OFI predicates its claim of error on the fact that the Court asked it at oral argument to walk through its scienter arguments one at a time and addressed them in the same fashion in its opinion. That the Court was thorough in explaining why it found scienter lacking as to each asserted misrepresentation does not suggest that it did not consider the allegations as a whole. To the contrary, it explicitly cited *Tellabs*, and its analysis shows that it understood the full allegations of the amended Complaint and yet found OFI's scienter argument lacking.

District Court did nothing to abuse its broad case management discretion in this instance.

[10] Our conclusion here is based on a holistic reading of the District Court's opinion. Because we agree with the Court that OFI's assertions are baseless, its limited explication of its scienter analysis suffices. We do note, however, that in closer cases than this one the District Court would be well served to grapple with the question of scienter with more explicit reference to the broader context.

21

While it would have been helpful for the District Court to explicitly note that it had considered all the arguments presented by the Complaint and assessed scienter holistically, the Court's opinion persuades us that it did so. We perceive no error in the District Court's conclusion that OFI failed to sufficiently plead scienter or in the Court's management of the arguments leading to that conclusion.

## C.    SECTION 10(B)

Section § 10(b) of the '34 Act prohibits the use of "any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe … ." 15 U.S.C. § 78j(b).    The SEC has in turn promulgated Rule 10b-5, which makes it unlawful for any person to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading … in connection with the purchase or sale of any security."[11] 17 C.F.R. § 240.10b-5.

To state a claim for securities fraud under § 10(b), a plaintiff must plead: (1) a material misrepresentation in connection with the purchase or sale of a security; (2) scienter, *i.e.*, a wrongful state of mind in the party making the representation; (3) reliance by the plaintiff; (4) economic loss; and (5) "loss causation, *i.e.*, a causal connection between the

---

[11] The Supreme Court has recently spoken about how to determine whether a statement was an "untrue statement of material fact" and whether it was "misleading," at least in the context of an alleged violation of § 11 of the Securities Act of 1933. *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318 (2015).    The parties here mentioned that case only in passing, and Cooper noted that our Court has yet to determine whether *Omnicare* applies to § 10(b) claims.    Given that the parties have not meaningfully addressed that question and there is no necessity to address it, we leave it for another day.

material misrepresentation and the loss." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005) (internal quotation marks and original emphasis omitted).

OFI alleges that various communications by Cooper to the public contained material misstatements or omissions in violation of § 10(b). Those communications include the Merger Agreement between Cooper and Apollo published on June 12, 2013; Cooper's 10-Q for the second quarter published on August 9, 2013; the Proxy Statement for the merger published on August 30, 2013; and two 8-K filings published on September 19 and 30, 2013. We address OFI's arguments *seriatim*.

### i.   The June 12, 2013 Merger Agreement

OFI says that the warranties in the Merger Agreement contained three material misrepresentations by Cooper – 1) that it had "exclusive possession" of the CCT facilities, 2) that it had "effective" "internal control over financial reporting" by the CCT joint venture, and 3) that it was not aware of any "threatened . . . labor strike or lock-out or any material dispute, walk-out, work stoppage or slow-down involving the Company or any of its Subsidiaries." (J.A. at 66, 102, 162, 164-65.)

We note first that the Merger Agreement also expressed two significant caveats. One was in Section 7.2(a), wherein the parties agreed that the "representations and warranties … set forth herein shall be true and correct in all respects (without giving effect to any materiality or 'Material Adverse Effect' qualifications contained therein) both when made . . . and as of the Closing Date." (J.A. at 169.) Cooper

24

asserts that this provision required that the statements in the Agreement be true only on the date it was signed, June 12, 2013, and the date of closing, a date which never occurred due to the merger's failure.

The second caveat was a lengthy disclaimer that read:

The Merger Agreement contains representations and warranties made by the Company and the Apollo Parties to, and solely for the benefit of, each other. The assertions embodied in the representations and warranties contained in the Merger Agreement are qualified by information in confidential disclosure letters provided by the parties to each other in connection with the signing of the Merger Agreement. … *You should not rely on the representations and warranties in the Merger Agreement as characterizations of the actual state of facts about the Company* or the Apollo Parties, since they were only made as of the date of the Merger Agreement and are modified in important part by the underlying disclosure letters. Moreover, *certain representations and warranties in the Merger Agreement were used for the purpose of allocating risk* between the Company and the Apollo Parties *rather than establishing matters as facts*. Finally, information concerning the subject matter of the representations and warranties may have changed since the date of the Merger Agreement, which subsequent information may

or may not be fully reflected in the companies' public disclosures.

(Opening Brief in Support of Motion to Dismiss, Exhibit G at 3, *OFI Risk Arbitrages v. Cooper Tire & Rubber Co.*, No. 14-cv-68-RGA (D. Del. Dec. 15, 2014), ECF No. 54 (emphasis added)). With these caveats in mind, we turn to the three alleged misrepresentations.

### a. *"Exclusive Possession"*

The first alleged misrepresentation is the Merger Agreement's statement that Cooper "'or one of its Subsidiaries ha[d] exclusive possession of each Owned Real Property and Leased Real Property,' including the CCT facilities." (J.A. at 102, ¶ 163.) OFI asserts that this statement was materially misleading because "Chengshan – and not Cooper – effectively controlled CCT's facilities." (Opening Br. at 30.) OFI points principally to three things to support its claim of misrepresentation – first, that "at least on[ce] … in the past few years … Chengshan denied Cooper management access to the [CCT] facility," [12] (J.A. at 65, ¶ 73); second, that

---

[12] OFI contends, at length, that Cooper admitted this to be a fact during the Chancery Court litigation. Cooper disagrees. Whether there was an admission, however, is irrelevant. Even taking the underlying assertion as true and admitted, it is insufficiently particular to support OFI's allegation of misrepresentation, as discussed below. Consequently, we need not determine if such an admission was made.

26

Chengshan and Che had "deep ties and embedded relationships with the Chinese government," (Opening Br. at 34); and third, that CCT had independent computer systems to which Cooper allegedly had limited access (J.A. at 64, ¶ 72). OFI claims those allegations were corroborated by confidential witnesses[13] who said that "Cooper had 'apparently very little' control over CCT," that "Chengshan 'pretty closely controlled CCT,'" and that CCT's independent financial system resulted in Cooper being "closed off" from CCT's financial information.[14] (J.A. at 64, ¶¶71-72.)

---

[13] The Complaint included comments from three confidential witnesses, all of whom were said to be former Cooper employees, identified by their role and tenure (*e.g.*, "Confidential Witness[] 1 [was] the Global Manager of Internal Audit … from 2010 through May 2013" (J.A. at 63)). The parties vigorously dispute the weight we should accord to the statements made by these individuals. Because our standard for evaluating confidential witness statements is well defined, *see Avaya*, 564 F.3d at 263, and because the statements in this case, even if fully credited, are either irrelevant or insufficiently particularized to support OFI's § 10(b) claims, we make no comment on this disagreement.

[14] OFI also asserts that the fact that CCT locked Cooper out of the facility *after* the Merger Agreement is evidence that they never had control of the facility. Such post hoc reasoning is inappropriate when evaluating what Cooper knew at the time the merger was announced, and we decline OFI's invitation to engage in it.

These alleged facts, taken together and as true, do not show that the identified statement was false. First and foremost, we agree with the District Court that the statement refers exclusively to the possession of real property. That being the case, we similarly agree that all the factual assertions regarding computer systems and ties to the Chinese government are not relevant, as they provide no reason to conclude that Cooper did not possess the CCT facility.

Thus, the only factual allegations that could suggest the identified statement was false are those relating to the alleged lock-out of Cooper personnel by CCT at some previous date and the testimony of the confidential witnesses about the lack of "control" over CCT by Cooper. Neither of those allegations is sufficiently particularized to support the conclusion upon which OFI insists – that Cooper "never" had exclusive control of the CCT facility. OFI's assertion regarding the "lock-out," (Opening Br. at 37), lacks any detail as to when the incident occurred, who was kept out, and what transpired during the incident and afterward. It does not provide any truly useful information about the status of the CCT facility and does not support the assertion that OFI would ultimately need to prove – that Cooper lacked "exclusive possession" of the CCT facility on June 12, 2013. Indeed, the high-specificity pleading standard set out by the PSLRA is intended to preclude our giving credence to allegations such as these, which fail to "plead the who, what, when, where and how" of a supposed misrepresentation. *Avaya*, 564 F.3d at 253. The confidential witness testimony, in addition to suffering from similarly fatal vagueness, is also not sufficiently on point. At best, the confidential witness statements demonstrate that Chengshan was the principal entity running the CCT joint venture. Even if true, that

28

conclusion does not mean that Cooper lacked possession of the underlying real property on the date in question. The District Court thus rightly concluded that the "exclusive possession" statement was not actionable.

### b. *Internal Controls*

OFI next alleges falsity in the Merger Agreement's statement that Cooper "maintains internal control over financial reporting [that is] effective in providing reasonable assurance regarding … prevention or timely detection of unauthorized acquisition, use or disposition of the Company's assets that could have a material effect on its financial statements." (J.A. at 162.) OFI's argument is predicated on CCT's financial system having been independent of Cooper's. That undisputed fact meant that Cooper relied on CCT to submit its financial data to Cooper's headquarters on a monthly basis to be incorporated into the company's broader financial reporting systems. OFI does not, however, allege that Cooper had experienced any difficulty with that arrangement in the past, let alone anything that would call into question its efficacy in detecting fraud that could materially affect Cooper's financial statements.[15] Having failed to plead any such facts, OFI relies on general assertions about the "illusory" nature of Cooper's "purported control" over CCT. (Opening Br. at 36.) Such statements lack the

---

[15] While CCT did ultimately prevent Cooper from gaining access to the financial information, there is no evidence that it did so until August 19, 2013. That event thus has no bearing on the truth or falsity of Cooper's June 13, 2013 assertions in the Merger Agreement.

29

necessary particularity required by the PSLRA and add no weight to OFI's argument.

### c. *Threatened Strikes*

OFI contends that Cooper's statement regarding threatened or pending labor strikes was a misrepresentation. Specifically, it points to the statement in the Merger Agreement that there was not "pending or … threatened, nor has there been for the past five years, any labor strike or lock-out or any material dispute, walk-out, work stoppage or slow-down involving [Cooper] or any of its Subsidiaries." (J.A. at 164.) That statement was materially misleading, OFI argues, with respect to both the workers at CCT and Cooper-employed members of the USW.

Beginning with the CCT labor disruption, OFI points to the allegation that Cooper knew that Chengshan would oppose the merger, based on a May 15, 2013 meeting at which Cooper and Apollo executives spoke with Che. Beyond that, OFI relies on general assertions about Che's alleged power over CCT, the same assertions that underpin its "exclusive possession" argument, insisting that we should infer knowledge on the part of Cooper that, "once the Merger Agreement was announced," Che's opposition would lead to "a 'threatened labor strike.'" (Opening Br. at 37-38.) We decline to connect those dots. That is the kind of inferential leap the PSLRA's heightened pleading standard is meant to prevent. How Che would react was an unknown. The Complaint contains no facts regarding the history of labor relations at CCT that show a strike was threatened or that Cooper knew a post-announcement strike was likely. In fact, the Complaint indicates that Che might have been supportive,

30

with the allegation that he was willing to go along if compensated. That a strike was later initiated at the CCT facility after the agreement was announced is of no moment.

Turning to Cooper's United States operations, OFI also asserts that Cooper "knew [that] the USW would view the Merger as a violation of its collective bargaining agreement given Cooper's failure to abide by certain successorship clauses in the agreement." (Opening Br. at 38.) As evidence of this knowledge, OFI points to statements by Cooper's and Apollo's lawyers before the Court of Chancery that they anticipated the USW would take the position that the successorship provision applied to the merger and that they would need to devise a solution. OFI also points to testimony that the attorneys expected the USW to file grievances on the issue and agreed to set up an expedited arbitration procedure to ensure that those grievances did not hold up the closing. However, OFI acknowledged that all of the actions taken by Cooper's and Apollo's lawyers were in preparation for the possibility that the USW would challenge the merger. The Complaint includes a statement by one of Cooper's lawyers that "Cooper executives believed" that they ought to "'try to convince the Steelworkers that the [successorship] provision did not apply'" to the merger. (J.A. at 67, ¶ 78.)

As the District Court properly recognized, all that OFI has pled with particularity is that there was risk of a dispute with the USW and that Cooper was aware of and was preparing for that risk. But "[p]reparing for responses to a major announcement does not mean that [Cooper] knew which responses would occur," and relying on the fact that the USW did ultimately file grievances is "an attempt to prove fraud by hindsight," something our Court has long

rejected. (J.A. at 12 (citing *Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.,* 394 F.3d 126, 158 (3d Cir. 2004)).) Nothing in the pleadings points to knowledge on the part of Cooper that a material dispute with the USW was either pending or threatened as of June 12, 2013. The fact that labor action followed does not make Cooper's statement false. Taken together and as true, OFI has failed to plead more than an awareness by Cooper that adverse labor action was possible. That falls well short of demonstrating with particularity that Cooper was aware of a pending or threatened labor action at the time the Merger Agreement was announced. As a result, Cooper's representation about a material labor dispute was not materially false. The District Court properly found OFI's claim in that regard to be wanting.

### ii.    The August 9, 2013 10-Q Filing

OFI next turns to the 10-Q statement filed by Cooper on August 9 for the fiscal quarter ending June 30, 2013, alleging two misrepresentations are in that document: 1) the statement that Cooper had maintained sufficient internal controls over its financial reporting, and 2) its characterization of the strike at CCT, in particular its start date, its "temporary" nature, and the motivating force behind it.

#### a. *Internal Controls*

OFI targets as misleading the statement in Cooper's 10-Q that there were "no other changes in the Company's internal controls over financial reporting during the quarter ended June 30, 2013 that have materially affected, or are reasonably likely to materially affect, the Company's internal

controls over financial reporting." (J.A. at 143.) The argument here mirrors OFI's argument about Cooper's representations in the Merger Agreement concerning internal controls. (*See supra* § C.1.b.) There is, however, the additional allegation that CCT effectively shut Cooper out the facility before the end of the reporting period on June 30 and out of its financial system by early July. OFI further asserts that Cooper failed in its duty to update its 10-Q once it knew that there were material changes to its control over financial reporting.

It is worth noting what OFI does not say. At no point does it challenge the accuracy or completeness of the financial information contained in the 10-Q, nor does it claim that the 10-Q omits or misstates any financial information relating specifically to CCT and its finances. The assertion is limited to an allegedly false claim of control over financial reporting. But OFI itself asserted that August 19, 2013 was the date as of which "Cooper could not collect information in its finance and accounting system to provide either internal or external financial reporting." (J.A. at 71, ¶ 86.) That this allegation in the Complaint appends to that date the parenthetical "(but most likely in early July)" is inconsequential. (*Id.*) Because these pleadings must be particularized under the PSLRA, a bald assertion that the date was "most likely" earlier, without more, is insufficient to support the allegation that Cooper's claim that their internal controls were operating normally was materially misleading. *See Avaya*, 564 F.3d at 253. Working from the facts that were pled with particularity, Cooper lost its ability to gather CCT's financial information ten days after the filing, and over a month after the reporting period closed. Thus any claim of falsity must be based on the same theory propounded with

33

respect to the Merger Agreement – namely that CCT's separate financial system made any alleged control by Cooper "illusory." As already discussed, that theory is without sufficient factual support to be actionable under §10(b).

Presumably in anticipation of that problem, OFI points to the requirements of 17 CFR § 229.308(c) and pivots to an assertion that Cooper had a duty to update its 10-Q. That regulation demands that parties "[d]isclose any change in the registrant's internal control over financial reporting," 17 CFR § 229.308(c), but the requirement to update is tied to the evaluations called for by 17 CFR §§ 240.13a-15(d) and 240.15d-15(d), both of which demand reporting of changes that "occurred during … the issuer's fiscal quarter[]." Nothing in the pleading suggests that there was, in fact, a change in Cooper's internal controls during the quarter ending June 30, the relevant reporting period for the 10-Q. That being the case, there was no requirement to update.[16]

---

[16] Even if Cooper's statements regarding the internal controls proved false, OFI has failed to sufficiently plead scienter. Specifically, the assertion that Cooper, Armes, or Hughes, with an "intent to deceive, manipulate, or defraud," *Avaya*, 564 F.3d at 252 (internal quotation marks omitted), withheld information about a loss of internal controls in this 10-Q is undermined by the fact that they reported having suffered exactly that loss only a few weeks later in Cooper's August 30, 2013 Proxy Statement. It is unclear why Cooper would risk litigation at a critical time by materially misrepresenting a fact, only to disclose the same fact mere weeks later. The more plausible inference – that Cooper simply did not lose control of the financial systems until

### b.  *CCT Strike*

OFI's other complaint regarding the 10-Q alleges a material misrepresentation in its statement about the strike at CCT, specifically Cooper's failure to identify Chengshan as the root cause of the strike and Cooper's characterization of the strike as temporary.[17]

Beginning with allegations regarding the source of the strike, OFI claims that Cooper's statement that "[t]he unionized work force at [CCT] implemented a work stoppage," (J.A. at 146), was misleading because Cooper knew that the strike "was orchestrated and implemented by Chengshan (not the 'unionized workforce')," (Opening Br. at 40).  In support of that assertion, OFI points to a meeting between Cooper executives and Che that took place on July 10, 2013.  At that meeting, the objective of which was to end the strike, Armes took notes indicating that Che wanted to stop the merger and would support the strike.  OFI also points to Armes's testimony wherein he confirmed that

August 19, 2013, when they admit they did – precludes the "strong inference" necessary to support OFI's claim.

[17] OFI also says in its brief that the 10-Q includes misstatements about the timing of the strike.  OFI did not raise that issue in the Complaint, nor did it ever mention the issue before the District Court.  Consequently, that argument is waived.  *See DIRECTV Inc. v. Seijas*, 508 F.3d 123, 125 n.1 (3d Cir. 2007) ("It is well established that arguments not raised before the District Court are waived on appeal.").

Cooper had been told that "Che was behind all that was going on" at CCT. (A70, ¶ 83.)

In its defense, Cooper asserts that it had no legal obligation to speculate about who was behind the strike and that any omission on that score did not make its statement materially misleading. There is some force to that response. To say that workers implemented a strike does not say who planned or motivated it. But, even taking the statement that the "unionized workforce [at CCT] implemented a work stoppage" (J.A. at 146) as implying that the strike originated with the union and its leadership, not management, it is still not actionable because the facts pled do not give rise to a "strong inference of scienter" while "tak[ing] into account plausible opposing inferences," *Winer Family Trust*, 503 F.3d at 327 (quoting *Tellabs*, 551 U.S. at 323). The strong inference must arise in the context of "*all* of the facts alleged, taken collectively … ." *Tellabs*, 551 U.S. at 323 (emphasis in original). Here, while the Complaint might, with some strain, be sufficient to state with particularity that there had been a misrepresentation, it still fails to raise a "strong inference" that Cooper, Armes, and Hughes were acting with a "mental state embracing intent to deceive, manipulate, or defraud." *Avaya*, 564 F.3d at 252 (internal quotation marks omitted).

The identified statement was a single phrase buried within a filing that encompassed dozens of pages. Beyond general assertions about the gains to Armes and Hughes if the merger successfully closed, OFI did not plead any facts demonstrating that the extra information about Che's support for the strike would have materially affected the closing of the merger. That being the case, it is unclear what Cooper, Armes, and Hughes stood to gain from this relatively minor

36

misrepresentation, if that's what it was. Other "plausible opposing inferences," including that the statement was simply imprecise or received little attention due to the context in which it was made, seem more likely than the inference that Cooper, Armes, or Hughes intentionally made this particular statement to defraud investors.

OFI's post hoc scouring of countless pages of documents for a stray and inartfully phrased comment that can be argued to be technically false seems like just the sort of litigation maneuver the PSLRA was meant to eliminate. One purpose of the statute is to prevent disappointed investors from treating every imprecise statement during a transaction as an invitation to file a lawsuit. *Cf.* H.R. Rep. No. 104-369, at 31-32 (1995) (Conf. Rep.) (noting that the statute aims to "discourage frivolous litigation" and "abusive practices," including "the routine filing of lawsuits against issuers of securities and others whenever there is a significant change in an issuer's stock price, without regard to any underlying culpability of the issuer, and with only faint hope that the discovery process might lead eventually to some plausible cause of action").

OFI further alleges, however, that because Cooper brought up the topic of the strike, it undertook a duty to accurately "convey the impact and nature of the strike and shutdown," which duty it breached by calling the strike a "temporary work stoppage." (Opening Br. at 40.) But because the description of the strike's nature is a forward-looking statement and is surrounded by cautionary language, it is protected by the PSLRA safe harbor provision. Adjacent to its acknowledgment of the July 13, 2013 work stoppage, Cooper noted that, "[i]f the Company is unable to resolve this

labor dispute or if there were to be an additional work stoppage or other work disruption, [Cooper's] business and operating results could suffer." (J.A. at 146.) Elsewhere in the document, where it referred to the strike as "temporary," Cooper also noted that, if there were "[a]n extended work stoppage at [CCT, it] could negatively affect the Company's future financial performance." (J.A. at 141.)[18] The 10-Q's acknowledgement of the business effects of the then-active strike, and its reference to the implications of that stoppage persisting or later being renewed, provided sufficient notice to the reader about the specific risks attached to the forward-looking statement. Consequently, we conclude that Cooper's statement classifying the work stoppage as "temporary" falls within the PSLRA safe harbor for forward-looking statements and adds no strength to OFI's § 10(b) claim.

### iii. The August 30, 2013 Proxy Statement

OFI complains next of the Proxy Statement released by Cooper on August 30, 2013. According to OFI, Cooper misled investors about the outlook for the merger by providing misleading projections, by underplaying the severity and effect of the strike at CCT, and by failing to

---

[18] Of note, the 10-Q also includes, in various places, warnings that it is filled with forward-looking statements, that those statements ought not be considered to be assurances, and that labor problems could confound any projections.

adequately disclose that rival suitor "Party C" was actually Chengshan.[19]

### a. *Projections*

OFI argues that "Cooper's financial projections presented in the Proxy Statement were objectively false because they were materially greater than the projections used internally and presented to Apollo just weeks earlier." (Opening Br. at 51.) The Complaint alleges that the forecasts provided to Apollo between July 21 and August 9, 2013 included a substantial drop in projected revenue and operating profits relative to the projections shared in the Proxy.[20] The projections included in the Proxy Statement are in fact more favorable than those that Cooper provided to Apollo in late July and early August, but that does not make the Proxy Statement false.

---

[19] OFI also makes a general allegation that Cooper "falsely and misleadingly assured investors that the Merger was on track." (Opening Br. at 44.) However, because it did not identify specific affirmative assertions in the Proxy that are false, this claim cannot meet the strictures of the PSLRA.

[20] The Complaint also references further revised projections provided to Apollo in September. Because those projections were not made until after the release of the August 30, 2013 Proxy Statement, they shed no light on what Cooper knew before that date.

The projections attached to the Proxy Statement did not stand alone as a statement of affirmative fact. Indeed, their inclusion is accompanied by a lengthy and specific disclaimer that states:

> [The] financial projections set forth below are included in this proxy statement only because this information was provided to the Apollo Parties … in connection with a potential transaction involving Cooper Tire … *You should not regard the inclusion of these projections in this proxy statement as an indication that Cooper Tire, the Apollo Parties,*[or other relevant parties] *considered or consider the projections to be necessarily predictive of actual future events, and you should not rely on the projections as such.*

(J.A. at 197-98) (emphasis added). It also referred to the documents as "outdated financial projections" and explicitly stated that Cooper "d[id] not intend to update" them. (J.A. at 198.)

The projections are plainly not included as statements of fact. Instead, the only relevant statement of fact is that the projections were, in fact, the projections that Cooper provided to Apollo and the financing bank during the negotiation of the deal. OFI does not allege that Cooper provided Apollo or the financing bank with some different set of projections during

negotiations. Consequently, OFI has not pled falsity as it relates to the projections.[21]

### b. *CCT Strike*

Next, OFI contends that Cooper's claim in the Proxy Statement that "[n]either the strike nor the plant slowdown are expected to have an effect on the consummation of the merger" was a material misrepresentation. (J.A. at 105-06, ¶¶ 174-75.) In support, OFI points to its allegation that the Vice Chairman of Apollo sent an email to Armes three days before the Proxy Statement went out that referenced the problems with accessing CCT financial records and stated that, "[w]ith no control over the financial records, there is little chance we can get a financing done given the need for your auditors to sign off," adding that "the completion of the [merger] may be jeopardized." (J.A. at 71-72, ¶ 87.) The weight of that particularized factual allegation is bolstered, says OFI, by the allegations that Cooper knew that Che had orchestrated the strike and had no intention of relenting until the merger was

---

[21] Even if the content of the projections were at issue, they would be covered by the PSLRA safe harbor codified at 15 U.S.C. § 78u-5(c)(1). The preamble to the projections directly identifies them as forward-looking statements and is replete with warnings that they had become "outdated," that no party involved considered them to be "predictive of actual future events," and that they constituted "aspirational projections based on a consistent growth rate rather than likely projections." (J.A. 198.) Such warnings are well within the ambit of the safe harbor provision, and the projections are therefore immunized from any § 10(b) claim.

defeated or he received a payoff. With Che ensuring that Cooper could not access the CCT financial records, and Apollo insisting that it needed the financial records to complete the merger, there was, according to OFI, no way that Cooper could have reasonably believed that the strike would not impede the merger closing, making any assertion to the contrary a deliberate and material misrepresentation.

This line of reasoning has significantly better traction than the rest of OFI's contentions, but it does not account for the PSLRA's safe harbor. The statement regarding the effect of the strike on the merger includes the word "expected," a term that identifies the statement as forward-looking. In its disclaimer regarding "Forward-Looking Statements," Cooper identified a number of relevant factors that "could cause [its] actual results and events to differ materially from those expressed or implied by forward-looking statements," including "the impact of labor problems, including disruptions at the Company," and "changes in [Cooper's] relationship with joint-venture partners." (J.A. at 182.) While those warnings could have been more direct, Cooper included considerable detail regarding the CCT strike, and in so doing supplied sufficient context to constitute cautionary language with respect to its forecast regarding the strike's outcome. Indeed, immediately before the statement about which OFI complains, the Proxy explained, in detail, that the strike was underway, that CCT's employees were "demanding termination of the merger," that the strike had started and stopped before, and that CCT was then denying Cooper access to the facility and withholding financial information. (J.A. 201.) Paired with those significant disclosures, Cooper's warnings cleared the bar for providing the "meaningful cautionary statements" required by the PLSRA

safe harbor provision. 15 U.S.C. § 78u-5(c)(1). Any investors reading that section of the Proxy Statement were on notice of the labor problem and could place in context Cooper's statement of general optimism that the situation would be resolved without affecting the merger.

To try to avoid that conclusion, OFI claims that Cooper cannot seek the shelter of the safe harbor provision because Cooper, Armes, and Hughes could not, given the facts on the ground at CCT, have believed that the strike would not impede the closing of the merger. Even if that premise were correct,[22] OFI misreads the law. The provisions

---

[22] That contention of intentional falsity is suspect, given what Cooper, Armes, and Hughes have said about the Material Adverse Effect clause of the Merger Agreement. They seem to have believed that clause allowed them to push the merger forward even in the event of problems at CCT. The fact that Cooper sued Apollo in the Court of Chancery in an attempt to obtain just such a result confirms that belief, and OFI's Complaint effectively concedes it. (*See* J.A. at 60-61, ¶ 63 ("Cooper negotiated a Material Adverse Effect clause in the Merger Agreement that Cooper believed would allow it to argue that a negative reaction by Chengshan would not constitute an event that would permit Apollo to walk away from the deal.").) That being the case, it is certainly a plausible inference that Cooper did not aim to deceive investors through this expressed optimism, but rather that it actually believed it could push the merger through even with the shutdown. However, because we need not reach this issue, we decline to opine on what Cooper and its officers did

of the safe harbor under § 78u-5(c)(1) are disjunctive; they immunize any forward-looking statement provided that *either* it is "accompanied by meaningful cautionary statements," *id*. § 78u-5(c)(1)(A), or "the plaintiff fails to prove the forward-looking statement … was made with actual knowledge … that the statement was false or misleading," *id*. § 78u-5(c)(1)(B). Thus, where a future-looking statement is accompanied by sufficient cautions, then "the state of mind of the individual making the statement is irrelevant, and the statement is not actionable regardless of the plaintiff's showing of scienter."[23] *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1112 (9th Cir. 2010). *See also, e.g.*, *Miller v. Champion Enterprises Inc.*, 346 F.3d 660, 672 (6th Cir. 2003) ("[I]f the statement qualifies as 'forward-looking' and is accompanied by sufficient cautionary language, a defendant's statement is protected regardless of the actual state of mind."); *Edward J. Goodman*

---

or did not believe about the efficacy of the Material Adverse Effect clause.

[23] This conclusion does not necessarily foreclose the possibility that knowing falsity *within* the cautionary language could undermine a claim to protection by the safe harbor. *See, e.g.*, *Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 734 (7th Cir. 2004), *as amended* (Sept. 3, 2004) (declining to dismiss a complaint under the safe harbor provision where the defendant "omitted important variables from the cautionary language and so made projections more certain than its internal estimates at the time warranted"). Because OFI has not challenged the meaningfulness of Cooper's cautionary language on such grounds, however, we need not decide that question here, and decline to do so.

*Life Income Trust v. Jabil Circuit, Inc.*, 594 F.3d 783, 795 (11th Cir. 2010) ("[A]n allegation of actual knowledge of falsity will not deprive a defendant of protection by the statutory safe harbor if his forward-looking statements are accompanied by meaningful cautionary language."); H.R. Rep. No. 104-369, at 44 (1995) (Conf. Rep.) ("The first prong of the safe harbor requires courts to examine only the cautionary statement accompanying the forward-looking statement. Courts should not examine the state of mind of the person making the statement.").

That being the case, whether Cooper, Armes, or Hughes believed that statement to be true at the time is irrelevant, as long as there was sufficient "meaningful cautionary language." Since such language was present, Cooper's statements regarding the impact of the strike on the merger agreement are protected by the PSLRA safe harbor and do not support OFI's §10(b) claim.

### c. *"Party C" Omission*

The final issue that OFI raises about the Proxy Statement is Cooper's failure to identify "Party C" as Chengshan. In laying out the timeline of merger negotiations between Cooper and Apollo, and between Cooper and a number of other parties referred to by pseudonym, the Proxy Statement reveals the existence of Party C and its role as a potential purchaser. OFI asserts that, because Cooper told shareholders of the existence of Party C, it put that party "in play" such that Cooper was then required to disclose that

Party C was a consortium led by Chengshan.[24] (Opening Br. at 45.) Unfortunately for OFI, and as noted by the District Court, § 10(b) and Rule 10b-5 do not impose liability for "statements that are simply incomplete," only those that are "misleading or untrue." *Winer Family Tr.*, 503 F.3d at 330. OFI's Complaint does not identify any affirmative statement by Cooper that is rendered untrue or misleading by the alleged fact that Chengshan was a participant in Party C.

OFI attempts to rescue its assertion by relying on *Shapiro v. UJB Financial Corp.* for the proposition that, once a subject is mentioned, the disclosing party is then "bound to speak truthfully" on the subject. 964 F.2d 272, 282 (3d Cir. 1992). OFI has misconstrued that obligation. In *Shapiro*, a defendant claimed its financial disclosures were the product of management practices that were "'adequate,' 'conservative,' 'cautious,' and the like," and we concluded

---

[24] It is not obvious that OFI has actually pled with particularity that Party C was, in fact, a consortium led by Chengshan. While it refers to that as a fact that was "later disclosed," (J.A. at 79, ¶ 106), the Complaint includes very little substance to back its assertion. It does identify several references that suggest that Chengshan had a role as one of the rival suitors, but those factual pleadings do not extend to the fact that Party C was the anonymous suitor led by Chengshan. The clearest evidence is a financial news post-mortem of the deal that reported that Chengshan was a part of the consortium that acted as a competing bidder and that further includes some details about Chengshan's involvement that match the statements about Party C in the proxy, including price per share.

that, by so describing those practices, "the subject [was] 'in play.'" *Id.* In other words, we held that once a party has made a characterization on a subject, it is on notice to speak truthfully about the subject of that characterization. But we are not faced with such a circumstance here. Cooper mentioned Party C in the August 30 Proxy Statement only as part of a much longer story of how the merger came to be. No reference to Party C included any characterizations that would trigger a need for additional disclosure. There thus was no misrepresentation by omission regarding Party C, and we confirm the conclusions of the District Court to that effect. In sum, no assertions in the Proxy Statement were material misrepresentations, and therefore nothing in the document lends support to OFI's § 10(b) claim.

### iv. The September 8-Ks

Finally, OFI alleges that the 8-Ks released by Cooper on the 19th and 30th of September 2013 were misleading because they failed to disclose that the USW arbitration decision, and Apollo's reaction to it, had placed the consummation of the merger in peril. In support of that allegation, OFI points to the testimony of Cooper's general counsel before the Court of Chancery describing Apollo's reaction to the USW arbitration decision and Apollo's stated concern about the share price for the merger in light of that decision and the difficulties at CCT. OFI also places great weight on statements by Armes that, as of late September, he had "a lot of reservations about whether [the deal] would close or not." (J.A. at 82, ¶ 113.) Although the Complaint alleges that Apollo "demanded a downward modification of the deal price beginning in September," (*id.*), the facts pled with specificity tell a more tempered story. The USW

47

arbitration decision does appear to have had some influence on Apollo's evaluation of the deal, but it is far from clear that it immediately precipitated a substantial change in position.[25] From the Complaint, it is apparent that, while Apollo expressed its displeasure with the agreed-upon price as of a meeting on September 17, it only "demanded a price reduction" over the phone on September 25. (J.A. at 83, ¶ 114.) The first formal request for a price reduction did not occur until September 28, when two emails from Apollo's counsel to Cooper's counsel requested a price reduction of $2.50 per share and asserted that the reduction was "necessary to see the Merger through." (J.A. at 83, ¶ 114).

Turning first to the 8-K dated September 19, 2013, the Complaint fails to plead with particularity that Apollo had requested a price reduction, let alone suggested that the merger's closing would be contingent on such a reduction, prior to the issuance of that 8-K. That being the case, OFI has not pled what it claims to be a material omission. What's more, even if such a request had been made, none of the statements made by Cooper in that document would have been rendered false or misleading by the omission of that development. OFI also complains that Cooper did not

---

[25] The Complaint quotes an Apollo representative as saying that, in addition to other concerns, "now we have this arbitration decision and the Steelworkers to deal with," but also includes the statement by that same representative that if they could "fit [the arbitration decision costs] in the financing great, but if not, they have to come out of somewhere, and that somewhere was Cooper shareholders … ." (J.A. at 82, ¶ 113.)

describe the merger as "imperiled" or in danger in its communication. (Opening Br. at 52.) But Cooper was under no obligation to use any adjective, let alone a pejorative one, to describe the state of the deal. *See In Re Donald J. Trump Casino Sec. Litig. – Taj Mahal Litig.*, 7 F.3d 357, 375 (3d Cir. 1993) ("We do not mean to suggest that § 10(b) or Rule 10b-5 requires insiders to characterize ... transactions with pejorative nouns or adjectives.") (internal quotation marks omitted). Consequently, OFI's allegations as to the September 19 8-K have no merit.

Turning to the September 30 8-K, OFI complains, albeit obliquely, that Cooper's omission of the fact that Apollo had demanded a price cut amounted to a material misrepresentation. That argument fails on two fronts. First, the omission of that fact did not make any affirmative statement misleading. Again, an omission, standing alone, does not create a cause of action under § 10(b). *See Winer Family Tr.*, 503 F.3d at 330 (explaining that, while "[l]iability may exist under [§10(b)] for misleading or untrue statements, [it does] not for statements that are simply incomplete"); *cf.* Information to be Included in the Report for Form 8-K (SEC Form 873), Section 1.02, at 5, https://www.sec.gov/about/forms/form8-k.pdf ("No disclosure is required … during negotiations or discussions regarding termination of a material definitive agreement unless and until the agreement has been terminated.").

Second, even if Cooper's failure to disclose the price reduction demand constituted a material misrepresentation, OFI has failed to establish a plausible inference of scienter. Cooper argues persuasively that it did not need to disclose the demanded price reduction because it believed Apollo had no

contractual right to demand such a reduction. That calls into question whether OFI's few relevant factual allegations could give rise to a "strong inference" that Cooper knew the omission of Apollo's request constituted a misrepresentation, *Avaya*, 564 F.3d at 267-68, especially when taken together with the fact that the Court of Chancery confirmed Cooper's belief on that score (J.A. at 304 (noting that "Apollo lacked the contractual right to demand renegotiation of the merger agreement based on the necessity to renegotiate USW contracts")). Cooper's choice not to disclose a request by Apollo that it was not entitled to make thus does not constitute an actionable material misrepresentation.

In sum, we find nothing of merit in OFI's allegations regarding either of the 8-Ks filed by Cooper in September 2013.

### C. SECTIONS 14(A) AND 20(A) CLAIMS

OFI advances two final claims of substantive error, arguing that the District Court improperly dismissed its claims under Section 14(a)[26] and Section 20(a)[27] of the '34 Act. OFI's § 14(a) claim is predicated on a finding of a

---

[26] Codified at 15 U.S.C. § 78n(a) and creating a cause of action for material misrepresentations made in a Proxy Statement.

[27] Codified at 15 U.S.C. § 78t(a) and establishing derivative liability for supervisors of those committing an independent violation of federal securities laws, in this case the alleged § 10(b) violations discussed *supra*.

material misrepresentation in the Proxy Statement and its § 20(a) claim is similarly predicated on a finding that a federal securities law was violated. Having concluded that the Proxy Statement contained no misrepresentation and that no laws were broken, we likewise conclude that there was no error in the District Court's dismissal of those claims.

**III.  CONCLUSION**

For the foregoing reasons, we will affirm.